**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Homer Foye GUNTER et al., Defendants-Appellants.**

**Nos. 75-1726 thru 75-1732.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 29, 1976.

Decided Dec. 22, 1976.

Rehearings Denied Feb. 4, 1977.

David L. Russell, U. S. Atty., and John E. Green, First Asst. U. S. Atty., Oklahoma City, Okl., for plaintiff-appellee.

John C. Williams, Oklahoma City, Okl. (Robert L. Wheeler, Oklahoma City, Okl., on the brief), for Homer Foye Gunter and Herbert Ray Billings, defendants-appellants.

Charles W. Stubbs, Oklahoma City, Okl. (Stubbs, Stiner & Pace, Oklahoma City, Okl., of counsel, on the brief), for Billy Wayne Myers, defendant-appellant.

John P. Smith, Oklahoma City, Okl. (Oyler & Smith, Oklahoma City, Okl., on the brief), for Michael Eugene Lamb, defendant-appellant.

Robert B. Smith, Oklahoma City, Okl. (Bloodworth, Smith & Biscone, Oklahoma City, Okl., on the brief), for Robert Haynes, defendant-appellant.

William W. Wiles, Jr., Oklahoma City, Okl., for Jimmy Ray Keeton and Paul Dean Quick, defendants-appellants.

Before HOLLOWAY, McWILLIAMS and BARRETT, Circuit Judges.

McWILLIAMS, Circuit Judge.

These seven appeals were separately briefed, but companioned for oral argument, and will be treated in one opinion. All arise out of a criminal prosecution for the theft of tires from an interstate shipment. Originally there were nine defendants. One defendant, Sherman Olive, agreed to testify, and did in fact testify, for the Government, and was not himself brought to trial. Another defendant, Thomas Lee, has not appealed his convic-

tion. The remaining seven defendants appeal their respective convictions and sentences.

The charge in count one of the indictment is that the defendants unlawfully, willfully and knowingly, and with an intent to convert to their own use, did steal, take, carry away, and conceal tires of a value in excess of $100 from a railroad car controlled by the Atchison, Topeka and Santa Fe Railway Company which was moving in interstate commerce, in violation of 18 U.S.C. § 659. In count two the defendants are charged with conspiracy to steal, take, carry away and conceal the tires from the aforesaid interstate shipment, in violation of 18 U.S.C. § 371. Lawrence Alan DuPont was a named, but unindicted co-conspirator, and at trial he was a key Government witness.

The first trial of this matter ended in a mistrial because of a hung jury. About a month later the eight defendants were again brought to trial, and this time the jury convicted Billy Wayne Myers and Michael Eugene Lamb on both counts, and, as to the remaining six defendants, a mistrial was again declared because of the inability of the jury to reach a verdict. About a month later the remaining six defendants were again tried, and on this occasion the six were convicted on both counts in the indictment.

On December 18, 1974, five hundred tires and twelve boxes of tire tubes were loaded aboard a Santa Fe box car at the Firestone Tire & Rubber Company plant in Shelby, Ohio, destined for the Firestone outlet in Oklahoma City, Oklahoma. On December 24, 1974, the Santa Fe box car filled with Firestone tires and tubes arrived in Oklahoma City, Oklahoma. Sometime between 9:00 p.m. on December 25, 1974, and 8:00 a.m. on December 26, 1974, this box car was broken into and approximately 240 tires and two boxes of tubes were stolen.

Two defendants, Herbert Ray Billings and Michael Eugene Lamb, contend on appeal that the evidence is legally insufficient to support the guilty verdicts returned against them. This particular matter will be dealt with later. At this point we would simply note that the other defendants do not contest, as such, the sufficiency of the evidence, although several do assert that the Government's case is based almost entirely on the testimony of DuPont and Olive, with the testimony of the former being characterized as "false testimony."

Without detailing the particular roles played by each of the defendants, DuPont's testimony indicated that he, along with certain of the defendants, broke into the box car and stole the tires and tubes in question. DuPont further testified that he and others then transported the tires in two stolen trucks to a barn located near Edmond, Oklahoma some 18 miles from Oklahoma City, Oklahoma, and that about a week later he and the defendant Lamb transferred the tires, or at least most of them, to a rented storage unit, referred to as a mini-warehouse, in Oklahoma City, Oklahoma. This is not an instance where all defendants were present at every step of the transaction. Five were in on the original theft, and others became involved in the subsequent carrying away and concealment of the tires. As indicated, these several appeals have been separately briefed, and separately argued, for that matter, though the separate appeals were companioned for argument before the same panel. As might be expected, certain arguments are common to more than one appeal. They will be dealt with first.

## I. Double Jeopardy

Myers and Lamb, who were convicted at the second trial, do not raise the double jeopardy argument. Robert Haynes, who was convicted in the third trial, does not raise the double jeopardy argument. The remaining four defendants, Homer Foye Gunter, Herbert Ray Billings, Jimmy Ray Keeton, and Paul Dean Quick, all contend that in trying them three times, their Fifth Amendment right not to be twice placed in jeopardy for the same offense was violated.

The double jeopardy argument was never really considered by the trial court,

but it would appear that such was not the fault of counsel. In any event, if in fact there were a violation of the defendants' Fifth Amendment right not to be twice placed in jeopardy for the same offense, such would surely be the type of "plain error" which could be raised for the first time on appeal. Fed.R.Crim.P. 52(b). This double jeopardy issue should be placed in context.

The jury in the first trial of the matter was discharged and a mistrial declared without objection from any of counsel. Nor, so far as we can determine from the record before us, was the plea of double jeopardy in any manner raised by any defendant prior to the second trial of the case.

As mentioned above, the jury in the second trial convicted the defendants Myers and Lamb, but was unable to agree on a verdict as to the six remaining defendants. The jury had only deliberated some four and a half hours, but clearly indicated to the trial judge that the members of the jury were in irreconcilable conflict as to the six. None of counsel for any of the six defendants voiced any objection to the discharging of the jury and the declaring of a mistrial. However, immediately after the jury had been discharged and a mistrial declared, the defendants, or at least one of them, attempted to move to dismiss on the ground of double jeopardy. The trial court summarily denied the motion, without any argument, and that ended the matter at the trial court level. However, in this court four defendants, Gunter, Billings, Keeton, and Quick, argue double jeopardy as their primary ground for reversal.

The Fifth Amendment provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." This constitutional provision was considered by the Supreme Court in *United States v. Perez,* 9 Wheat. 579, 22 U.S. 579, 6 L.Ed. 165 (1824), and thereafter considered by the Court on numerous other occasions. Certain decisions are not, to us at least, completely reconcilable. However, in each instance there has been a reaffirmation of *Perez,* so *Perez* is our starting point.

In *Perez* the jury was unable to agree on a verdict in a capital case, and was accordingly discharged by order of the trial court. Such was done without the consent of counsel. The defendant thereupon claimed his right to a dismissal and the judges of the trial court, sitting en banc, were divided. Upon a certificate of division the Supreme Court held that the discharge of the jury because of the jurors' inability to agree upon a verdict did not bar a subsequent trial for the same offense. In thus holding the Supreme Court stated that trial courts are vested with discretionary authority to discharge a jury from giving any verdict "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would be otherwise defeated." The obvious inference is that if the jury be discharged in accord with *Perez,* a defendant could be tried a second time for the same offense without offending the Fifth Amendment. Other cases in accord with *Perez* are *Keerl v. Montana,* 213 U.S. 135, 29 S.Ct. 469, 53 L.Ed. 734 (1909); *Dreyer v. Illinois,* 187 U.S. 71, 23 S.Ct. 28, 47 L.Ed. 79 (1902); and *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892).

The Supreme Court in addition has had occasion to more recently reaffirm the rule of *Perez.* In *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), an Army court martial was terminated because of a missing Government witness and when the accused was brought before a second court martial for the same offense he pleaded double jeopardy. The plea was overruled and he was convicted. The Supreme Court in such instance held that the plea of double jeopardy was unavailing and affirmed the conviction. In so holding the Supreme Court observed that unforeseeable circumstances may arise during the course of a trial which make its conclusion impossible, "such as the failure of a jury to agree on a verdict."

In *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), a jury was discharged over objection when it

was discovered that a key Government witness was missing. In this case the Supreme Court held that the Fifth Amendment barred a second trial on the same charge. However, in so doing, the court in *Downum,* as it did in *Wade,* stated that there are occasions when a second trial may be held where the jury empaneled for the first trial was discharged without reaching a verdict and without the accused's consent, "[T]he classic example . . . [being] a mistrial because the jury is unable to agree."

In *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) a state trial court, on motion and over the objection of defense counsel, ordered a mistrial because of an incurable defect in the indictment. Thereafter the accused was reindicted, tried and convicted, the state court rejecting defendant's plea of double jeopardy. The defendant thereafter sought habeas corpus relief in the federal courts, and the Seventh Circuit eventually granted such relief. On certiorari the Supreme Court reversed and held that the second trial of the defendant did not offend the Fifth Amendment. In thus holding the Supreme Court commented on the interests of the public in seeing that a criminal prosecution proceed to verdict, either of conviction or acquittal, and otherwise gave approval to *Perez* by stating that "manifest necessity" justified the discharge of juries unable to reach verdicts, and the retrial thereafter of the defendant.

From the foregoing we conclude that an accused may be tried a second time for the same offense where the jury in the first trial was unable to agree upon a verdict and was discharged because of such fact, and a mistrial declared. Accordingly, in the instant case the eight defendants were properly brought to a second trial on the same indictment. Indeed, as we understand it, no defendant raised the double jeopardy argument prior to the commencement of the second trial, and the matter was first presented to the trial court, or, more accurately, the matter was first sought to be raised before the trial court between the second and third trials. Does the fact that four defendants were brought to a third trial, as opposed to a second trial, make available to them the double jeopardy argument? Under the circumstances we think not.

Certainly the rationale of *Perez* and the other cases cited would not preclude a third trial where the first and second trials *both* resulted in mistrials based on the fact of a hung jury. Indeed the rationale of *Perez* suggests to us the propriety of a third trial where the prior juries were unable to agree upon a verdict. This assumes, of course, that the concept of "manifest necessity" and "ends of public justice" referred to in *Perez* are met. Here, in the first trial of the matter, eight defendants were brought to trial in a single trial, with each defendant apparently having separate counsel. In such circumstance some jury confusion would appear to be inevitable. The same situation prevailed at the second trial. Here, however, two defendants, Myers and Lamb, were convicted. Bringing the six remaining defendants to a third trial would appear to us to meet the conditions of *Perez* concerning manifest necessity and public interest. There indeed may be a breaking point, but we do not believe it was reached in the instant case.

The cases relied on for the double jeopardy argument are in our view inapposite. In *United States ex rel. Webb v. Court of Common Pleas,* 516 F.2d 1034 (3rd Cir. 1975), the Third Circuit held that the federal district court should have enjoined the Commonwealth of Pennsylvania from trying the defendant for the third time on a robbery charge. Each of the first two trials had ended in mistrials because of the inability of the jury to agree upon a verdict. The Third Circuit apparently turned its decision on the fact that the trial judge at the second trial abused his discretion in declaring a mistrial. In the absence of such abuse, it would appear that a third trial would not have offended the Fifth Amendment jeopardy provisions. In the instant case the action of the trial court in declaring mistrials in the first two trials of this matter did not in our view constitute an

abuse of discretion. It is true that the jury in the second case deliberated only some four and one-half hours. But the propriety of a mistrial does not depend alone on the number of hours a jury has been deliberating. Here the colloquy between the trial judge and the jury indicated clearly there was irreconcilable conflict as to the guilt or innocence of six of the defendants.

Nor does the rationale of *Carsey v. United States,* 129 U.S.App.D.C. 205, 392 F.2d 810 (1967) fit our case. There the defendant was tried four times for the same offense, namely, murder. The first two trials resulted in hung juries and a mistrial based thereon. The third trial also resulted in a mistrial when defense counsel made improper comment to the jury concerning the earlier mistrials. The fourth trial resulted in a conviction for second-degree murder. On appeal the District of Columbia Circuit, by a 2–1 vote, reversed and held that the prohibition against double jeopardy contained in the Fifth Amendment precluded the fourth trial. In so holding, the majority concluded that the trial court in the third trial abused its discretion in declaring a mistrial and that accordingly, a subsequent plea of double jeopardy should have been sustained. In the instant case there were only three trials, not four, as in *Carsey.* And more importantly in our case the trial court, in our view, did not abuse its discretion in either of its two earlier orders declaring a mistrial.

In sum, the conditions of *Perez* were in our view met, and the trial of Gunter, Billings, Keeton, and Quick for a third time did not offend the Fifth Amendment. For illustrative cases holding that a third trial of a defendant where the first two trials resulted in hung juries does not violate the Fifth Amendment, see *United States v. Castellanos,* 478 F.2d 749 (2nd Cir. 1973) and *United States v. Berniker,* 439 F.2d 686 (9th Cir. 1971).

II. Unlawful Search

All seven appellants contend that their respective convictions should be reversed because of the search by Government agents of the mini-warehouse in Oklahoma City, Oklahoma. DuPont and Haynes, along with Myers, Olive and Gunter, were the five who apparently first determined to go to the railroad yards to search for a box car to break into. However, Haynes did not himself go to the yards, and it was DuPont, and the others, who located the box car full of tires and tubes. And it was DuPont, and the others, who broke into the car and stole the tires and tubes and transported them in two trucks to a barn some 18 miles removed from Oklahoma City, Oklahoma.

About a week after the theft it was decided to bring the tires, or at least a portion of them, back to Oklahoma City. It was in this setting that DuPont, apparently at the suggestion of Robert Haynes, and using the latter's money, rented the mini-warehouse. In renting the premises DuPont used a fictitious name, George Lloyd Haney. DuPont bought a padlock with which he locked the mini-warehouse, giving the keys to Haynes. Later DuPont obtained the keys from Haynes, and DuPont and Lamb, using a U-Haul trailer, transferred a number of the tires from the barn to the mini-warehouse. The keys were returned to Haynes. Later DuPont again got the keys from Haynes and opened the mini-warehouse in order to get two tires which he wanted for his own use. The keys once again were returned to Haynes.

Solution of this theft apparently started with the arrest of DuPont. The FBI agents sought and obtained the voluntary consent of DuPont to search the mini-warehouse. The ensuing search disclosed the stolen tires, which were later received into evidence at the trial. A motion to suppress had been earlier heard and denied. At this hearing it was argued that under the circumstances, only Robert Haynes had the authority to consent to a search of the mini-warehouse, and that DuPont had no such authority. We do not agree with this argument.

A search of property, without a warrant and without probable cause, but

with proper consent, does not offend the Fourth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In the instant case the search of the mini-warehouse was without warrant and from the record we cannot tell whether the search was based on probable cause. In any event, the Government seeks to validate the search on the basis of DuPont's consent thereto. It has been held that the consent to a search by one who possessed common authority over premises or effects is valid against the absent, nonconsenting person with whom authority is shared. *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

Similarly, in *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court stated that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that consent was obtained from a third party "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." By footnote (p. 171, 94 S.Ct. p. 993) the court in *Matlock* observed that common authority is not to be implied from the mere fact that the third party may have a property interest in the premises or effects sought to be inspected, since the authority which justifies a third party's consent "does not rest upon the law of property, with its attendant historical and legal refinements . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

Under the foregoing authorities we conclude that both DuPont and Haynes had either "common authority or other sufficient relationship to the premises or effects sought to be inspected," to the end that either could give valid consent to search the mini-warehouse. In reaching this conclusion, *all* of the surrounding facts and circumstances must be considered, as no one fact, such as Haynes' possession of the keys, for example, can be deemed decisive.

DuPont, at Haynes' suggestion, and with the latter's money, rented the premises. Insofar as the landlord was concerned, then, DuPont was the tenant. DuPont placed the padlock on the mini-warehouse, and turned the keys over to Haynes. Thereafter, however, DuPont obtained the keys from Haynes, and he, with the assistance of Lamb, hauled the tires in from the barn some 18 miles away and physically stored the tires in the mini-warehouse. And of course these were tires that DuPont had himself stolen. Again, DuPont on another occasion obtained the keys from Haynes and took from the mini-warehouse two tires which he needed for his own use. Under all these circumstances we conclude that both DuPont and Haynes had either "common authority" over the mini-warehouse, or "other sufficient relationship to the *premises or effects* sought to be inspected" (emphasis added), so that either could give a valid consent to the search of the warehouse. In sum, then, the search was legal.

III. Amending the Indictment

In count one of the indictment it was alleged that the defendant "did steal, take, carry away *and* conceal" (emphasis added). In the instructions given at the third trial of the case the jury was instructed that an essential element in count one was "the act of having unlawfully taken possession of *or* carrying away *or* concealing goods or chattels" (emphasis added). In other words, complaint is made that the indictment used the conjunctive "and", whereas the instruction used the disjunctive "or." Such did not in our view constitute any amendment of the indictment. And the fact that such may have differed from the instructions given the jury in the prior trials is of no significance. It is hornbook law that a crime denounced in the statute

disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive. *United States v. Pauldino,* 443 F.2d 1108 (10th Cir. 1971).

The remaining grounds for reversal do not merit extended comment. Several appellants argue that the prosecution proceeded on the premise that there was one continuing conspiracy to steal, take, carry away, conceal, and then to sell the tires and tubes in question, whereas in fact there was not just one conspiracy, but many. We agree with the prosecution's position that there was one conspiracy, and find no error. *United States v. Russo,* 527 F.2d 1051 (10th Cir. 1975).

[11] The jury, while deliberating, sent a note to the judge asking for a definition of the word "tacitly." Without consulting with counsel, the trial judge simply sent a Webster's dictionary into the jury room. Such may well have been error, but if it be deemed error, it was most certainly harmless error. No prejudice has been shown.

Several appellants attack the testimony of DuPont, the unindicted co-conspirator, and Olive, the named defendant who agreed to testify for the Government and was never prosecuted. Such testimony is labeled as "false." A jury may convict on the uncorroborated testimony of an accomplice. *United States v. Downen,* 496 F.2d 314 (10th Cir. 1974) and *Johns v. United States,* 227 F.2d 374 (10th Cir. 1955). Here, however, there was corroborative evidence. In an event, the credibility to be given DuPont and Olive was for the jury.

Minor complaint is also made that the trial court unduly limited defendants' cross-examination of certain of the Government's witnesses, particularly DuPont, and refused to let counsel develop the inconsistencies between DuPont's testimony at the third trial with his testimony at the earlier trials. The latitude to be given in cross-examination is a discretionary matter resting with the trial court, and we find no abuse of that discretion here. *Carpenter v. United States,* 463 F.2d 397 (10th Cir. 1972) and *Whitlock v. United States,* 429 F.2d 942 (10th Cir. 1070).

[15] Billings and Lamb suggest that there was insufficient evidence to sustain the guilty verdicts returned against them. We do not agree. On the night of the theft, after the tires had been located, but before they were actually stolen, there was a meeting in Billings' apartment, with Billings present, and the subject matter of this meeting was how the tires would be transported from the box car to the barn. A friend of Billings, who was apparently unknown to any of the defendants, was willing to donate his Diesel, but this plan bogged down when the Diesel lost a wheel. As a result, two vans were stolen and used to transport the tires from the box car to the barn. Also, the record indicates that Billings was to get a share of the proceeds received from the sale of the tires. The evidence was sufficient to tie Billings into the conspiracy.

Lamb rented a U-Haul and he and DuPont then transported a good many of the stolen tires from the barn to the mini-warehouse rented by DuPont. Lamb argues that any participation on his part was innocent and unwitting. We think the issue as to his knowledge presented a jury question. Going to an isolated barn 18 miles into the country and finding therein 240 new tires is in itself sufficient to raise a jury question as to whether Lamb knew he was dealing with stolen goods.

Judgments affirmed.