**Pedro Patlan ALVAREZ, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 81SC36.**

Supreme Court of Colorado, En Banc.

Nov. 15, 1982.

J. Gregory Walta, Colo., State Public Defender, Steven J. Merker, Richard P. Holme, Sp. Deputy State Public Defenders, Denver, for petitioner.

J.D. MacFarlane, Colo. Atty. Gen., Richard Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., David K. Rees, Asst. Atty. Gen., Denver, for respondent.

Alperstein, Alperstein & Forman, Donald W. Alperstein, Denver, Designated Counsel for respondent.

LOHR, Justice.

The defendant, Pedro Patlan Alvarez, was convicted of second-degree assault [1] after trial to a jury. The Colorado Court of Appeals affirmed in *People v. Alvarez*, 624 P.2d 358 (Colo.App.1980), and we granted certiorari. The defendant challenges his conviction on three grounds. First, Alvarez argues that he was prejudiced by a juror's use of a dictionary to aid her in understanding terms contained in the jury instructions. Second, the defendant claims his due process rights were violated when the trial court received evidence that he had been identified by a witness as one of the assailants during an inadvertent "one-on-one showup" at the police station shortly after the crime. Finally, the defendant asserts that the trial court violated due process requirements in allowing two witnesses to testify that they recognized a photograph of the defendant, taken at the police station on the night of the incident, as the man they had seen assaulting the victim. Although we find that admission of the disputed identification evidence produced no constitutional defects, we agree that the juror's resort to a dictionary to determine the meaning of words found in a key instruction was reversible error. Accordingly, we reverse and remand for a new trial.

1. The defendant was convicted under Section 18–3–203(1)(a), C.R.S.1973.

2. The description of the incident is based on the testimony of the defendant, the victim, and the two other eyewitnesses who testified at the trial. The most significant conflict in this essentially consistent evidence is whether the de-

I.

This prosecution stems from an assault that occurred outside the Silver Moon Bar in Fort Lupton on June 21, 1977.[2] That evening at about 8:00 p.m., Irma Gonzales and Salvador Velasquez were sitting in the bar drinking beer when an acquaintance of theirs, Ernesto Martinez, Jr., entered the bar and requested that Velasquez accompany him outside. Gonzales stayed inside the bar while the two walked out. Moments later, the barmaid called Gonzales' attention to a fight that was taking place outside. Gonzales went out and saw Velasquez on the ground being kicked by three men. An acquaintance of Gonzales', Joe Diaz, was standing by, neither participating nor attempting to stop the fight. Gonzales identified Martinez as one of the assailants and described the other two as a man in a white shirt, and a man in a black hat and coveralls, with a full beard and long hair. This description of the three men was consistent with less detailed information given by Juanita Lopez, a woman who lived across the street from the bar and viewed the incident from her yard and the adjoining street. After the assault, the three men and Joe Diaz got into Martinez' pickup truck and drove away.

Velasquez sustained a badly broken jaw and other injuries as a result of the beating. He was unable to describe the persons who attacked him and was unsure of their number.

The defendant, Alvarez, testified that he was at the scene of the beating but that he attempted to stop it. Alvarez gave the following account of the events of the day. On the afternoon of June 21, 1977, he drove from his home to Fort Lupton, where he and Joe Diaz met Ernesto Martinez, Jr., across the street from the Silver Moon Bar.[3]

fendant participated in the assault, as the two eyewitnesses testified, or attempted to restrain one of the assailants, as the defendant related.

3. Gonzales observed this incident and testified that Joe Diaz and a man in a white shirt also arrived in Alvarez' pickup and left with Mar-

Alvarez parked his pickup truck and the three men then rode together in Martinez' truck to a number of sugar beet farms in the area looking for work. Alvarez described Martinez as a "crew leader," a person hired to help in securing farm work.

That evening, Alvarez' testimony continued, the three men drove back into town, where Martinez stopped to visit his father. The three had been drinking beer throughout the course of the afternoon. Martinez went inside his father's house while the defendant and Diaz stayed in the truck. When Martinez returned, he appeared upset, stating to the others that someone had been bothering his father that afternoon. Martinez drove his pickup to the Silver Moon Bar and went inside while Alvarez and Diaz stayed in the truck. The defendant testified that he did not get out of the truck until he saw a crowd congregating around a fight outside the bar. Martinez and a man in a white shirt, whom the defendant did not know, were beating Velasquez. The defendant described the man in the white shirt as tall, with long hair and a small beard. Alvarez testified that he and Diaz approached the fight scene, and Alvarez tried to grab Martinez from behind in an effort to restrain him.[4] Martinez shoved the defendant to the ground, and by the time Alvarez stood up, the other three men were entering Martinez' truck. The defendant got into the truck with them, momentarily forgetting that he had parked his own truck nearby earlier that day. A short distance away from the bar, Alvarez got out of Martinez' truck, walked back to the bar, got into his own truck and proceeded toward home.

Alvarez was apprehended before he reached home by a police officer who noted that the appearance of the defendant and his truck matched Gonzales' description of a bearded man wearing a black hat and driv-

ing a pickup truck with a described license number.[5] The defendant was taken to the police station, where Gonzales was waiting to be interviewed by police. Alvarez was brought into the station handcuffed, in the custody of two officers, when Gonzales saw him. She did not say anything when she first saw Alvarez, but then, after being asked by the police whether she had seen him before, stated that he was one of the men who had beaten Velasquez.

Prior to trial, defense counsel moved to suppress evidence of the inadvertent one-on-one showup at the police station, and also requested that a lineup identification procedure be conducted to determine if the state's two identification witnesses, Gonzales and Lopez, would be able to identify the defendant. A lineup was conducted at a pretrial suppression hearing on November 30, 1977, at which time Gonzales selected a man other than the defendant and Lopez did not pick any of the persons in the lineup. The defendant was among the men in the lineup but had shaved his beard between the date of the incident and the lineup. Defense counsel suggested that Alvarez would grow his beard before trial for the purpose of a second lineup procedure in order to meet the anticipated argument by the prosecution that the first lineup was unreliable because the defendant had appeared without a beard. The court then ruled that Gonzales' identification testimony would not be limited or suppressed in any way and that, if Lopez still should be unable to identify the defendant in the second lineup, Lopez' testimony would be limited to her description of the assailants as she remembered them.

On the first day of trial, less than a month after the pretrial suppression hearing, another lineup was conducted after jury selection but prior to the opening statements. The defendant's beard had

---

tinez. Alvarez made no mention of being with a man in a white shirt.

**4.** During the defendant's case, Gonzales and Lopez reaffirmed their testimony that the man in the black hat and beard was kicking the victim. They also stated that they did not see

that man attempt to pull Martinez away from the victim.

**5.** Gonzales had observed the man with the black hat and beard park the pickup near the Silver Moon Bar earlier that day.

grown, and he later testified it looked the same as in a picture taken at the time of his arrest and received in evidence. Gonzales again did not identify the defendant, but picked the same man she had chosen out of the first lineup. Lopez was unable to identify any of the lineup participants as the black-hatted assailant. After the lineup, defense counsel renewed his motion to suppress all identification evidence. The prosecutor stipulated that he would not ask either Lopez or Gonzales to identify the defendant at trial as one of the participants in the assault by pointing him out in the courtroom. The court ruled that Gonzales and Lopez could describe the assailants as they remembered them and Gonzales could testify about the one-on-one showup. At trial, during the defendant's case, Gonzales and Lopez testified about the results of the two pretrial lineups.

When the arresting police officer was cross-examined during the trial, defense counsel introduced into evidence a photograph of the defendant taken at the police station on the night of his arrest.[6] Later, over defense counsel's objection that the prosecutor had already shown the picture to Gonzales and Lopez together in violation of a sequestration order, the prosecutor recalled these two witnesses and questioned them about the photograph. Gonzales positively identified the man pictured as the person she had seen assault Velasquez, and Lopez testified that he looked very much like that man.

**6.** In a discussion held out of the hearing of the jury, defense counsel explained that his purpose in introducing the photograph was to show it to Gonzales and Lopez in the hope that they would not be able to identify it as a picture of the man they had seen commit the assault. Defense counsel felt this tactic might be successful since both Gonzales and Lopez had failed to identify the defendant in the two lineups.

**7.** The full instruction reads as follows:
The burden of proof is upon the People to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all of the elements necessary to constitute the crime charged.
Reasonable doubt means a doubt based upon reason and common sense which arises

At the close of evidence, the court instructed the jury on the law and included the standard instruction that the prosecution was required to prove each element of the offense "beyond a reasonable doubt."[7] The jury retired to begin its deliberations at 2:10 p.m., and at day's end, almost four hours later, still had not reached a verdict. The jurors then returned to their homes for the night under instructions that they should not discuss the case with their families or friends. One of the jurors was troubled as to whether her doubts were "reasonable," "imaginary," or "vague," terms used in the reasonable doubt instruction, and she consulted her dictionary at home for the definitions of these words. The next day, she discussed these definitions with one other juror, and the two of them decided that their doubts were "vague" and not "reasonable." The two jurors then voted to find the defendant guilty, and Alvarez was convicted.

## II.

■ Alvarez argues that the juror's consultation of her dictionary during deliberations and her relation of dictionary definitions to another juror constitute such serious misconduct that prejudice to the defendant sufficient to require reversal can be implied from proof of the misconduct alone without an affirmative showing of prejudice. Alternatively, Alvarez contends that he has shown prejudice sufficient for rever-

from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable men to hesitate to act in matters of importance to themselves.
If you find from the evidence that each and every element has been proven beyond a reasonable doubt, you will find the defendant guilty. If you find from the evidence that the People have failed to prove any one or more of the elements beyond a reasonable doubt you will find the defendant not guilty.
The court gave the instruction orally and in a written form available to the jurors during their deliberations.

sal because the affidavit of one juror establishes that she decided that her doubts were not reasonable in reliance on the dictionary definitions, showing a direct causal relationship between use of improper material and the defendant's conviction. We agree that the record in this case establishes that the juror's use of a dictionary substantially prejudiced the defendant, so his conviction must be reversed. This makes it unnecessary to consider the merit of the defendant's proposition that even without a showing of prejudice a juror's use of a dictionary requires reversal.

There can be no question but that a juror's consultation of a dictionary to assist in understanding legal terminology in the court's instructions is improper. Jurors are required to follow only the law as it is given in the court's instructions to the jury, whether or not they personally agree or disagree with such instructions. *Colorado Jury Instructions (Criminal)* 1:3.[8] The words "reasonable," "doubt," "imaginary," and "vague" may not have significance as legal concepts when used separately in everyday parlance; however, the term "reasonable doubt" describes one of the most fundamental legal concepts in the prosecution of criminal offenders. The jurors are bound, therefore, to accept the court's definition of this legal concept, and to obtain clarifications of any ambiguities in terminology from the trial judge, not from extraneous sources. *See Nichols v. Seaboard Coastline Ry. Co.,* 341 So.2d 671, 677 (Ala. 1977) (unauthorized consultation of dictionary for definitions of legal terms violates juror's "sworn duty to apply the law *as charged by the court* to the facts of the case...."). *See generally,* Annot., 54 A.L.R.2d 738 (1957).

The remaining question is whether this improper juror conduct requires reversal. In considering whether other types of jury misconduct mandate reversal of a conviction, we have consistently held that a defendant must establish that he was prejudiced by the misconduct in order to overturn his conviction. *People v. Mackey,* 185 Colo. 24, 521 P.2d 910 (1974); *People v. Peery,* 180 Colo. 161, 503 P.2d 350 (1972); *Milano v. People,* 159 Colo. 419, 412 P.2d 225 (1966); *Segura v. People,* 159 Colo. 371, 412 P.2d 227 (1966). The defendant urges, however, that prejudice should be conclusively presumed when a juror consults a dictionary for aid in understanding words used in the court's instructions. We need not reach that question in this case, for the record amply establishes that the defendant was prejudiced in fact by juror misconduct.

Two jurors submitted affidavits[9] wherein they expressed serious doubts about the defendant's guilt. The first juror believed that Gonzales had told the truth, but thought it was possible that, in all the excitement, she could have been mistaken that the defendant was kicking Velasquez rather than attempting to stop Martinez. This juror was so troubled by her doubts that she consulted her dictionary for help. She looked up the words "vague," "imaginary," "doubt," and "reasonable," each of which appears in the court's instruction on reasonable doubt.[10] The juror admits that the dictionary definition of "vague" helped her make up her mind that her doubt was not reasonable. A second juror stated that on the first day of deliberations she initially voted not guilty, but, becoming persuaded that her doubts were vague, changed her vote to guilty at the end of the day. The next morning, she reconsidered her vote change in light of the dictionary definitions

---

**8.** *Colorado Jury Instructions (Criminal)* 1:3 provides in pertinent part:

The law as given by the court constitutes the only law for your guidance, and it is your duty to accept and follow it even though you may disagree with it.

The jury in this case was so instructed.

**9.** The state contends that affidavits of jurors may not be used to impeach their verdict. While this is the rule when such affidavits are

used to reveal the mental processes of the jurors in reaching the verdict, affidavits may be considered when misconduct and external influences are involved. *See Santilli v. Pueblo,* 184 Colo. 432, 521 P.2d 170 (1974).

**10.** The record does not identify the dictionary consulted or set forth the definitions found there.

that the first juror discussed with her. She ultimately decided her doubt was a "vague" one and accordingly stayed with her vote of guilty. The second juror admits that she continues to have doubts about Alvarez' guilt.

The central fact is that the juror who looked up the words was aided by the dictionary definitions in deciding that her doubt was not reasonable. This decision was essential to the defendant's conviction. We hold that this adequately established prejudice resulting from juror misconduct and requires reversal.[11]

## III.

Because the juror misconduct constitutes sufficient grounds for reversal, we are not required to decide whether the defendant's two other assignments of error also require that his conviction be overturned. However, we elect to address these issues since the trial court will of necessity be confronted with them again on retrial.

The defendant argues that his due process rights were violated when the trial court denied his motion to suppress Gonzales' testimony regarding the one-on-one showup at the police station shortly after the incident. He also asserts that the admission of the in-court identification of a police mug shot by Gonzales and Lopez denied him due process because the identification was tainted by the impermissible suggestion of the district attorney when he showed the photograph to the witnesses prior to their testimony. Because identity is not an issue in this case under the facts as they were developed at the trial, we conclude that the identification procedures do not implicate the defendant's due process rights.

 It is well established that a defendant's right to due process of law is violated by admitting into evidence the results of an unnecessarily suggestive identification procedure unless the totality of the circumstances establishes that the procedure did not result in a substantial likelihood of an irreparable misidentification despite its suggestiveness. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The factors to be considered in evaluating the reliability of the identification are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154; *accord, People v. Smith,* 620 P.2d 232, 238 (Colo.1980). In applying the totality of the circumstances test, these factors must be weighed together against the corrupting effect of the suggestive identification itself. *Manson v. Brathwaite, supra.*

 The cases represented by *Manson v. Brathwaite* and *People v. Smith* involve contexts where identification is an essential element of the prosecution's case and is not admitted by the defendant. Under the proof as developed in the case now before us, however, the defendant admits that he was present at the scene of the assault. Moreover, he agrees that he was the bearded person wearing a black hat and coveralls. The uncontroverted evidence was that only one person fit that description. The crucial difference between the defendant's testimony and that of prosecution witnesses Gonzales and Lopez was the nature of his participation in the fray. Gonzales and Lopez testified that he was kicking the victim. The defendant maintained that, to the contrary, he was attempting to restrain Martinez from further assaulting Velasquez. Thus, the issue was not whether the defendant was the person seen by Gonzales and Lopez; instead, the question is the nature of his activities.

---

11. It is futile to speculate how the juror might have voted without the benefit of dictionary definitions and equally futile to inquire whether the use made of the definitions resulted in a meaning of reasonable doubt consistent with the law. The defendant cannot reasonably be required to resolve these problematic matters as a part of his required showing of prejudice.

The ·due process value protected by the exclusionary requirement of *Manson v. Brathwaite, supra,* is fairness. *Id.* Under the totality of circumstances present here, no principle of fairness was violated by allowing the jury to consider identification evidence that merely corroborated the defendant's own admission that he was the person observed at the scene of the crime. We therefore hold that, upon consideration of the record in its entirety, due process of law was not violated by admitting Gonzales' testimony of the police station show-up and by admitting the in-court photographic identification by Gonzales and Lopez.

On retrial it will be the prosecution's burden to prove each element of the offense beyond a reasonable doubt. *E.g., In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *People v. Chavez,* 621 P.2d 1362 (Colo.1981). This burden includes establishing that the defendant was present and participated in the assault. If the record at the new trial contains proof of the defendant's admission that he was the man in the black hat, beard and coveralls involved in the incident when the challenged identification evidence is presented, no due process issue will be implicated and the admissibility of that evidence should be determined by usual evidentiary principles. As this seems to be the likely evidentiary posture on retrial, we believe no useful purpose would be served by evaluating the identification evidence under due process principles in this opinion.

We reverse the judgment of the Colorado Court of Appeals and return the case to that court with directions that it be remanded to the district court for a new trial.

HODGES, C.J., and LEE and ROVIRA, JJ., dissent.

LEE, Justice, dissenting.

I heartily join in the dissenting opinion of Justice Rovira. I find it difficult to understand why the majority views the conduct of the first juror in consulting the dictionary to clarify her understanding of the words "vague" and "imaginary," "doubt" and "reasonable" as misconduct so egregious as to warrant setting aside the guilty verdict in this case. As the opinion of the court of appeals suggests, the words are not legal terms but are common words. That they are combined into the definitional instruction of reasonable doubt does not change their basic meaning. Since they are not legal terms of art, they do not have a special meaning. If that were so, special definitional instructions would of necessity be given in order to convey that special meaning to the jury.

In my view, the affidavits simply do not establish that the jurors applied any other rule of law than that contained in the instructions. The defendant has totally failed to establish that the verdict was the result of the first juror's consultation of her dictionary or that the second juror changed her mind as a result of her discussions with the first juror. Undoubtedly, the verdict of guilty was based on the record of evidence establishing the defendant's criminal conduct beyond a reasonable doubt.

I would affirm the judgment of the court of appeals upholding the jury verdict.

I am authorized to say that Chief Justice HODGES and Justice ROVIRA join in this dissent.

ROVIRA, Justice, dissenting in part and concurring in part:

I dissent from Part II of the majority opinion and would therefore affirm the judgment of the Colorado Court of Appeals.

I am of the opinion that consultation of a dictionary by a juror to look up the meaning of a common English word is not *per se* jury misconduct sufficient to warrant reversal of a jury verdict without a showing by the defendant of prejudice.

Once the *per se* rule has been determined not to be applicable, as it has in this case, the burden should be on the defendant to establish that juror misconduct denied him a fair trial and thus deprived him of substantial rights. I do not agree that the defendant here has sustained that burden.

The only evidence offered to support the defendant's claim of prejudice was the affi-

davits of two jurors. The first juror's affidavit stated:

"Mr. Lacklen [State Public Defender and trial counsel] contacted me and asked me to make a statement on my guilty verdict concerning the trial against Pedro Alvarez.

I had a very difficult time reaching a verdict for several reasons. First of all because of the facts and/or lack of facts and because of the way the facts were presented to the jury.

The main reason was a doubt I had about the testimony given by Ms. Gonzales. Not that I believed she didn't tell the truth, for she had no reason to lie, but could she have been mistaken in what she saw? She couldn't have had but a minute or two and it had to be very confusing moments. She saw her friend lying on the ground, hurt very badly, maybe dead, people standing around and feet kicking. Was it possible she thought the defendant was kicking her friend, when he might have been trying to stop Mr. Martinez?

I had to decide whether my doubt was a reasonable doubt or if it was an imaginary or vague doubt. I couldn't sleep that night so I looked up the words vague, imaginary, doubt, and reasonable. I discussed the definitions when we met the next morning with the other jurors. The definition for vague: not sharp, clear, certain, etc. in thought or expression, helped me make up my mind. I decided my doubt was a vague doubt and not a reasonable doubt. Ms. Gonzales had been able to give a very detailed report of what she saw and had seemed very sure of her testimony."

The second juror's affidavit stated:

"I ... had voted not guilty at the beginning of Deliberation. I stayed with this decision through the 4½ hour period. At this time, I considered my doubts to be vague after hearing facts from other Jurors. At that time we adjourned until the following morning. My vote at this time was guilty. The next morning in Deliberation, one Juror had looked up some words in the dictionary; words such as *vague* and *speculate*. I then debated as

to whether I should have changed my vote the night before. After another 2 hours of Deliberation, the other Juror and myself decided our doubts to be vague. I still have these same doubts."

As is clear from the first juror's affidavit, she had not determined whether the doubt in her mind was a "reasonable doubt" or whether it was an "imaginary or vague doubt" when the jury recessed for the evening. She consulted a dictionary, not in an attempt to redefine a term of art like "reasonable doubt," but to confirm or gain an understanding of the words used by the court in defining the term "reasonable doubt."

We have not hesitated to consult dictionaries in an attempt to determine the common meaning of words. *See, e.g., People v. Phillips*, 652 P.2d 575 (Colo.1982); *People v. Gallegos,* 193 Colo. 108, 563 P.2d 937 (1977); *People v. Blue*, 190 Colo. 95, 544 P.2d 385 (1975). The same practice governs the interpretation of contractual language. *See Lorenzen v. Mustard's Last Stand, Inc.,* 196 Colo. 265, 586 P.2d 12 (1978).

The courts have often recognized that dictionary definitions are taken as matters of common knowledge which members of a jury are supposed to possess when the court's instructions are read to them. *In Re Estate of Cory,* 169 N.W.2d 837 (Iowa 1969); *Dulaney v. Burns,* 218 Ala. 493, 119 So. 21 (1928). If this were not so, every word in every instruction would have to be defined for the jury.

I disagree with the court's conclusion that the affidavit of the first juror establishes prejudice in fact because the dictionary definition of "vague" helped her to make up her mind that her doubt was not reasonable. To the same extent, I do not agree that the defendant was prejudiced by the action of the second juror who, prior to the evening adjournment had voted "guilty" and who, after discussing the meaning of "vague" with the first juror, reaffirmed her vote of guilty. The dictionary definition of "vague" and "speculate" did not in fact cause her to change her mind to the defendant's prejudice. The court's conclusion that the defendant was prejudiced is not sup-

**1135**

ported by the only evidence tendered by the defendant.

The court by its decision today is in effect drawing an artificial line and permitting a jury verdict to be overturned because a juror sought to clarify in her own mind the meaning of ordinary words.

If a juror should by happenstance have in mind the dictionary meaning of a word such as "vague" at the time deliberations commenced and informed the other jurors of his knowledge, would this constitute juror misconduct? I would think not, but the rationale of the majority opinion leads to that conclusion. The most that can be said is that the act of the juror in looking in the dictionary to determine the meaning of common words, not legal terms, is harmless error. *U.S. v. Gunter,* 546 F.2d 861 (10th Cir.1976), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977). *See also Wilson v. State,* 495 S.W.2d 927 (Texas Cr.App. 1973).

I am authorized to say that Chief Justice HODGES and Justice LEE join in this dissent and concurrence.