**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Deborah WADLE, Respondent.**

**No. 03SC340.**

Supreme Court of Colorado,
En Banc.

Sept. 13, 2004.

Ken Salazar, Attorney General, Catherine P. Adkisson, First Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Petitioner.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado, Dennis W. Hartley, P.C., Dennis W. Hartley, Colorado Springs, Colorado, Burke & Neuwirth, P.C., Dean Neuwirth, Denver, Colorado, Attorneys for Respondent.

Justice COATS delivered the Opinion of the Court.

The People sought review of the court of appeals' judgment in *People v. Wadle*, 77 P.3d 764 (Colo.App.2003), reversing the defendant's conviction for child abuse resulting in death. The district court rejected the defendant's motion for new trial, which alleged improper consideration by the jury of information acquired through the Internet, after the evidence was closed and deliberations had already begun. That information briefly described the characteristics and uses of a prescription drug being taken by the defendant. Although the jury's misconduct and its exposure to extraneous information were clearly established, the district court declined to order a new trial, finding there to be no reasonable possibility that the extraneous information affected the verdict.

Because the court of appeals applied a proper legal standard and correctly determined that there indeed was a reasonable possibility that the extraneous information would have affected the verdict of a typical jury, its judgment is affirmed.

## I.

Deborah Wadle was charged with first-degree murder and child abuse resulting in death, following the death of her four-month-old step-grandson. At her first trial, Wadle was acquitted of first-degree murder, but the jury failed to reach a verdict on the additional, child abuse charge. At a second trial, she was convicted of child abuse resulting in death and was sentenced to a mandatory minimum term of sixteen years in the Department of Corrections.

It was undisputed that the infant had been in the defendant's sole care when she called 911 to report that he had stopped breathing. Because no one else was present and the infant exhibited no external signs of trauma, evidence of the cause of death (apart from the defendant's testimony that she never shook him) was presented entirely through medical experts—nine for the prosecution and eight for the defense. The prosecution sought to explain the child's death as the result of shaken baby syndrome; the defense, as the result of a seizure and subsequent choking on the child's own vomit.

The defendant's husband, who arrived home in time to help with the attempt to resuscitate the infant, was also called as a witness by both the prosecution and the defense. In response to prosecution questioning, he conceded that his wife was taking medication for stress at the time the death occurred. Later, as a witness for the defense, he explained, in the course of direct- and cross-examination, that the medication to which he referred was an anti-depressant called Paxil; that it made the defendant less exuberant or lively; and that the defendant had not told her friends about the medication. The defendant herself explained, in response to questions posed by the prosecution during her own cross-examination, that she sometimes took Paxil for holiday-related stress, including on the day in question, and she admitted that she never made this known

to her friends. Neither prosecution nor defense pursued the matter further.

During its deliberations, the jury sent a note to the court, asking why a doctor would prescribe Paxil instead of another anti-depression or anti-anxiety drug and requesting a copy of the Physician's Desk Reference. The court responded that supplying reference materials of any kind to a jury was prohibited, and it referred the jury back to its instructions. The following day, the jury returned a verdict of guilty.

The morning after the verdict was received, two jurors contacted the court and informed it that after it denied the jury's request for a Physician's Desk Reference, a third juror researched and downloaded from the Internet a definition of Paxil. These two jurors expressed their concern that their review of the Internet definition violated the court's instructions. After notifying counsel, the trial court examined all three jurors. Among other things, the jurors' testimony indicated that despite the court's admonition, one of them searched the Internet, found a description of Paxil and its uses, and shared that description with the other jurors.

The juror who injected the extraneous information apparently reconstructed his search and testified that the description consisted of the following two, short paragraphs:

Paroxetine (pa-ROX-uh-teen) is used to treat mental depression, obsessive-compulsive disorder, panic disorder, and social anxiety disorder (also known as social phobia).

Paroxetine belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs). These medicines are thought to work by increasing the activity of the chemical serotonin in the brain.

Following this testimony, the defendant moved for a new trial. Although the trial judge and the prosecution both agreed with the defendant that juror misconduct was clear, the court denied the motion, finding that there was no reasonable possibility the extraneous information affected the verdict.

In reaching this conclusion, the trial court reasoned that the reference to "mental depression" in the description of Paxil was not contradictory of any testimony elicited at trial by the defense and that the extraneous information had no impact of significance on the jurors. Based on the jurors' testimony, it found that the Internet information failed to confirm the earlier statements of a fourth juror who told the others, from her own experience as an emergency medical technician, that Paxil was used for more serious conditions; that a juror who clearly understood the Internet information to confirm that Paxil was used for violent cases was simply mistaken; and that the Internet information did not actually engender further debate about the conditions for which Paxil might be prescribed.

The court of appeals reversed, disapproving the trial court's approach and finding a reasonable possibility that the extraneous information did influence the verdict to the defendant's detriment. Distinguishing the introduction of evidence to establish extraneous influences on a jury, from the introduction of evidence to demonstrate how the improperly received information was actually used by the jurors in their deliberative process, the appellate court looked to the possible effects of the extraneous information on a typical jury, in light of the record of trial and the jury's communication with the court. Noting especially the number of conflicting expert opinions offered at trial; the jurors' concerns (as evidenced by their earlier note) about the decision to prescribe Paxil and what that decision implied about the defendant's disposition and behavior; and the inferences that could be drawn by average jurors, without specialized knowledge or further explanation, from psychiatric terms like "obsessive-compulsive disorder," "panic disorder," and "social phobia," the appellate court concluded that the trial court erred as a matter of law in discounting the likelihood that the verdict was affected by the extraneous information.

The People petitioned for a writ of certiorari to address, in particular, the appropriate standard for reviewing the trial court's initial determination that there was "no reasonable possibility" that the extraneous information influenced the verdict.

## II.

■ It is well-settled that the exposure of a jury to information or influences outside of the trial process itself, whether or not that exposure occurred as the result of deliberate juror misconduct, may require reversal of a criminal conviction. *See Turner v. Louisiana,* 379 U.S. 466, 472, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (jury verdict must be based on evidence developed at trial); *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) ("presumption of prejudice" arises from private, third-party contacts with jurors); *Wiser v. People,* 732 P.2d 1139, 1141 (Colo.1987)(improper to use dictionary for definition of legal terms and to ask outside parties about the source of jury instructions); *see generally* 5 WAYNE R. LAFAVE ET AL., *Criminal Procedure* § 24.9(f) (2d ed.1999). The precise circumstances under which particular contacts, information, or influences will require a new trial and the manner in which that determination should be made is, however, less well-settled. *Compare United States v. Cheek,* 94 F.3d 136 (4th Cir.1996) (explaining and applying *Remmer's* "presumption of prejudice" to "extrajudicial communications and contacts," whenever they amount to more than "innocuous interventions," and permitting rebuttal of the presumption only by a demonstration that there exists no reasonable possibility they influenced the verdict) *with United States v. Williams–Davis,* 90 F.3d 490 (D.C.Cir.1996) (rejecting application of *Remmer's* "presumption of prejudice" to juror contact with third parties, exposure to media reports, use of dictionary, failure to fully disclose during voir dire, and having pre-deliberation discussions, in light of subsequent holdings in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), and adoption of FRE 606(b); and noting differences in treatment of jury exposure to outside source material in five other federal circuits); *cf. Carpenter v. Gomez,* 516 U.S. 981, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995) (Stevens, J., respecting the denial of the petition for writ of certiorari) (noting uncertainty of standard for reversal of capital conviction for jury exposure to outside information); *McIlwain v. United States,* 464 U.S. 972, 104 S.Ct. 409, 78 L.Ed.2d 349 (1983) (Marshall & Brennan, JJ., dissenting from denial of certiorari) (questioning scope of *Phillips,* "actual bias" test for certain juror misconduct).

Almost two decades ago this court rejected any requirement that a defendant establish actual prejudice from the jury's use of outside legal source material discovered after an adverse verdict had already been reached. *See Wiser,* 732 P.2d 1139. Instead, in reliance upon CRE 606(b) and the holdings of a number of federal circuit courts of appeal, we held that an objective test, concerned with the effect that the juror misconduct would have had on a "typical jury," should be applied in such cases. *Id.* at 1142. Rejecting the more absolute standard applied by some federal courts—that a new trial should be required whenever there was the "slightest possibility" that a typical juror would have been affected—we held that the relevant question should be whether there existed a "reasonable possibility" that the extraneous contact or influence affected the verdict to the detriment of the defendant. *Id.* at 1142 & n. 5; *cf. Harper v. People,* 817 P.2d 77 (Colo.1991)(prescribing a different procedure to evaluate the effects of exposure to news coverage, raised before a verdict). Without expressly addressing the presumption of *Remmer,* we implicitly questioned its applicability, at least to the consultation of extra-record information, by emphasizing that the objective test "eschews rebuttable presumptions that are conclusive in effect," in light of the impossibility of rebuttal. *Wiser,* 732 P.2d at 1143.

In furtherance of long-accepted precepts of jury sanctity, now codified in the Federal and Colorado Rules of Evidence, the objective test makes unnecessary any factual determination about the actual effect of extraneous information on a particular jury's deliberations. Unlike the deliberations themselves, however, Rule 606(b) permits inquiry into the question whether extraneous prejudicial information was improperly brought to the juror's attention or whether any outside influence was improperly brought to bear upon any juror. Consistent with the rule, the only inquiry into the jury's exposure to extrane-

ous information, and therefore the only historical factfinding, appropriately conducted by the trial court concerns the circumstances surrounding the jury's exposure to outside information or influences and the nature of the information or influences to which it has been exposed. *Cf. United States v. Prime,* 363 F.3d 1028, 1037–38 (9th Cir.2004)(articulating a variety of factors that may be considered without invading jury deliberations); *Vigil v. Zavaras,* 298 F.3d 935, 941 (10th Cir.2002)(articulating a similar multi-factor test).

Because inquiry into the jury's deliberations is otherwise prohibited, the objective test requires an assessment of the impact of the outside information by considering its likely impact on a typical jury. The context in which that determination must be made is provided by the record of the trial itself. The reasonable likelihood of an outside communication's impact on a "hypothetical average juror," *United States v. Greer,* 285 F.3d 158, 173 (2d Cir.2000), ultimately requires the application of a "controlling legal standard to the historical facts." *People v. Matheny,* 46 P.3d 453, 459 (Colo.2002) (quoting from *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), with reference to the "reasonable person" aspect of *Miranda* "custody" determination).

As distinguished from the trial court's historical factfinding concerning the circumstances and nature of an extraneous communication with the jury, the determination of a "reasonable possibility" of influence is therefore properly characterized as a mixed question of law and fact. *Id.* at 461; *see, e.g., Caliendo v. Warden,* 365 F.3d 691, 698 (9th Cir.2004) (in context of federal habeas corpus proceeding, whether unauthorized juror communication prejudiced the defendant is a "mixed question of law and fact"); *Vigil v. Zavaras,* 298 F.3d at 941 (10th Cir.2002) (same). At least where such questions implicate constitutional rights, as do assertions of exposure to extraneous information, we have held that they must be treated as questions of law, requiring independent consideration by reviewing courts. *See Matheny,* 46 P.3d at 461 ("[T]he obligation to independently review mixed questions of law and fact that implicate constitutional rights is an extremely important appellate principle."); *see, e.g., United States v. Prime,* 363 F.3d at 1037 ("Where jurors are exposed to extrinsic evidence, however, we are to engage in an independent review of the entire record."); *United States v. Greer,* 285 F.3d at 174 ("After making an 'independent determination' as to [whether the extrinsic information would not have affected a typical juror], we agree [with the District Court].")

■ A de novo, or independent, review of the likelihood that the verdict of a hypothetical jury would have been affected is in no way inconsistent with the deferential review generally accorded rulings on motions for new trial. The decision of a trial court to grant or deny a new trial is a matter entrusted to the court's discretion and will not be disturbed on review absent an abuse of that discretion. *People v. Gallagher,* 194 Colo. 121, 570 P.2d 236 (1977). In ruling on a motion for new trial, however, trial courts are regularly called upon to resolve questions of fact and apply standards of law. "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *see also United States v. Aguilar–Ayala,* 120 F.3d 176, 178 (9th Cir.1997) ("The district court's legal error is per se an abuse of discretion that requires reversal.")

■ Because the "abuse-of-discretion standard includes review to determine that the [trial court's] discretion was not guided by erroneous legal conclusions," *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), it is unnecessary to carve out an exception or reconcile previous references to the abuse-of-discretion standard in reviewing rulings on motions for new trial based on extraneous communications. *But see United States v. Cheek,* 94 F.3d 136, 140 (4th Cir.1996)(because objective standard for extrajudicial communications or contacts depends on legal conclusions, it is reviewed under a "somewhat narrowed," modified abuse of discretion standard giving appellate courts more lati-

tude than in other situations). Although a motion for new trial alleging extraneous jury communications typically requires resolution by the trial court of questions of historical fact, the question whether a reasonable possibility of influence exists is a matter of law, as to which an erroneous determination inevitably gives rise to an abuse of discretion.

### III.

■ There has never been a dispute about the information to which the jury was exposed in this case, or the timing or circumstances of that exposure. Similarly, neither party suggests that the jury's exposure to the Internet description of Paxil amounted to anything other than an extraneous communication to which the objective test of *Wiser* should apply. Instead, the People challenge only the court of appeals' failure to defer to the trial court's finding and, ultimately, the court of appeals' own finding of a reasonable possibility that this extraneous information influenced the verdict to the detriment of the defendant.

The trial court clearly misunderstood the import of the objective test. It not only permitted inquiry into discussions had by the jurors during their deliberations, and into the mental impressions of particular jurors; it also clearly relied on the substance of those discussions and mental impressions in finding an absence of prejudicial impact. Furthermore, to the extent that at least one particular juror actually understood the information to substantiate that Paxil was used for violent cases, the trial court merely discounted that interpretation as unreasonable or unjustified.

The objective test does not superimpose a requirement of objective reasonableness on an actual jury's reactions to the extraneous communications. Rather, it provides an alternate way of evaluating the impact of extraneous communications on a jury, without violating the sanctity of the jury's deliberations. As such, the objective test is concerned with typicality, not objective reasonableness. In context, the term "reasonable possibility" describes a degree of likelihood and implies a realistic possibility that the communication would influence the verdict of a typical juror. It does not discount the likely reactions of typical jurors to the extent that those reactions may not be objectively reasonable. The trial court's discretion was therefore guided by an erroneous understanding of the applicable legal standard.

■ Without regard to any actual impact that may have been improperly uncovered at the hearing, however, it is clear there existed at least a reasonable possibility that the extraneous information to which the jury was exposed influenced the verdict. Virtually the only disputed issue at trial was whether the child's death resulted from a seizure or from the child being shaken by his grandmother. Because both explanations of the physical evidence were strongly supported by medical experts, any evidence of a predisposition to shake the child took on a greater significance. If an independent Internet investigation into the drug Paxil were not itself sufficient to imply something significant about a typical juror's motivation for conducting it, a key circumstance surrounding the extraneous communication in this case (and one that was knowable without offending the limitations of CRE 606(b)) was the timing of the investigation—following immediately upon the heels of an unsuccessful request for information intended to distinguish the prescription of Paxil from the prescription of other antidepressant drugs.

From testimony permitted by CRE 606(b), it was undisputed that information from an apparently authoritative source was illicitly rooted out by one juror and brought to the attention of the full jury, well before it returned a guilty verdict. From the short list of conditions for which Paxil would be prescribed, according to this information, a juror could naturally infer that someone for whom Paxil had been prescribed might well suffer from a "phobia," or an "obsessive-compulsive" or "panic disorder." The dispositive question posed by the objective standard is simply whether there was a reasonable possibility that a typical juror, without specialized medical training or an opportunity for further inquiry, would have been influenced by this information to conclude that the defendant was abnormally obsessive, compulsive, or given to panic, and as a result of that

abnormal condition, temporarily lost control and shook her fussing, four-month-old step-grandson. Under the circumstances of this case, to ask the question is to answer it.

## IV.

Although the decision to grant or deny a new trial is a matter within the sound discretion of the trial court, the question whether there exists a reasonable possibility that extraneous communications with a jury influenced its verdict is a matter of law, to be resolved independently by a reviewing court. Because the court of appeals applied the proper legal standard and correctly determined that there was a reasonable possibility that the extraneous communication in this case affected the verdict to the detriment of the defendant, its judgment is affirmed.