The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 23, 2020

## 2020COA108

**No. 16CA2201, *People v. Newman* — Evidence — Competency of Juror as Witness — Inquiry into Validity of Verdict or Indictment — Extraneous Prejudicial Information**

A division of the court of appeals addresses for the first time the definition of "legal content" as that term is used to define what constitutes "extraneous prejudicial information" under CRE 606(b). The division concludes that, in the context of CRE 606(b), extraneous "legal content" refers to a statement of law that is inconsistent with or supplemental to the instructions provided by the trial court. Because the defendant presented credible evidence that extraneous prejudicial information may have been introduced to the jury, the division concludes that the trial court erroneously denied the defendant's motion for a new trial without affording him an evidentiary hearing.

COLORADO COURT OF APPEALS                              **2020COA108**

Court of Appeals No. 16CA2201
City and County of Denver District Court No. 15CR5700
Honorable Brian R. Whitney, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Damon D. Newman,

Defendant-Appellant.

JUDGMENT VACATED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE TOW
Román and Pawar, JJ., concur

Announced July 23, 2020

Philip J. Weiser, Attorney General, Wendy J. Ritz, First Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Jurors are generally permitted, even expected, to lean on their own experience and background — including "their professional expertise and education" — during deliberations. *Kendrick v. Pippin*, 252 P.3d 1052, 1065 (Colo. 2011), *abrogated on other grounds by Bedor v. Johnson*, 2013 CO 4. But what if that professional expertise and education is in the law? In this appeal, we must explore the boundaries of what a juror who is a lawyer may do and say during deliberations. In doing so, we address for the first time the definition of "legal content" as that term is used to define what constitutes "extraneous prejudicial information" under CRE 606(b). We conclude that, in the context of CRE 606(b), extraneous "legal content" refers to a statement of law that is inconsistent with or supplemental to the instructions provided by the trial court.

¶ 2 After a jury convicted defendant, Damon D. Newman, of sexual assault, but before he was sentenced, Newman filed a motion for a new trial, asserting that one of the jurors — a lawyer — introduced extraneous prejudicial information during deliberations. The trial court denied the motion without a hearing. Because Newman provided competent evidence that extraneous prejudicial

1

information was improperly before the jury, we conclude that he was entitled to a hearing on two of the claims in his motion. Thus, we vacate the judgment of conviction and remand for an evidentiary hearing on Newman's request for a new trial.

## I. Background[1]

¶ 3    In March 2011, D.B. reported to the Denver Police Department that she had been sexually assaulted at gunpoint. As part of the ensuing investigation, D.B. completed a sexual assault examination kit. The examination revealed DNA belonging to an unidentified male.

¶ 4    Newman, who had been living in Colorado at the time of the assault, moved to California in the spring of 2012. Newman was later arrested in California on an unrelated offense, and a DNA sample was obtained from him. In October 2015, Denver police were alerted that Newman's DNA had been run through the CODIS multistate DNA database and was a preliminary match with the

---

[1] The factual background set forth here is gleaned from the evidence presented at trial. In the event Newman is successful in obtaining a new trial on remand, we do not intend for this recitation to be taken as having any preclusive effect, as the determination of the facts would remain in the sole purview of a new jury.

DNA from the March 2011 assault. Newman was then extradited to Colorado and charged with one count of sexual assault armed with a deadly weapon.

¶ 5 At trial, Newman testified in his own defense. He admitted to having sexual relations with D.B. but maintained that it was consensual. Following the trial, a jury convicted Newman as charged.

¶ 6 Prior to sentencing, Newman filed a motion for a new trial asserting that he was denied his constitutional right to a fair trial because extraneous prejudicial information had improperly been before the jury during their deliberations. Accompanying Newman's motion was a signed and sworn affidavit from one of the jurors — Juror S.P. — which alleged that Juror M.O., a practicing attorney, had made a number of statements during deliberations concerning criminal law and proceedings. It also alleged that he had conducted outside research regarding character evidence and shared the results of his research with the rest of the jury.

¶ 7 The trial court denied Newman's motion for a new trial without conducting a hearing, concluding that none of the statements detailed in the affidavit constituted extraneous prejudicial

information, and thus the court could not consider the statements under CRE 606(b).  Newman filed a motion for reconsideration, but that too was denied.

¶ 8    Ultimately, Newman was sentenced to an indeterminate term of thirty-two years to life in prison.  He now appeals the denial of his motion for new trial.

## II.    Standard of Review

¶ 9    "The decision of a trial court to grant or deny a new trial is a matter entrusted to the court's discretion and will not be disturbed on review absent an abuse of that discretion."  *People v. Wadle*, 97 P.3d 932, 936 (Colo. 2004).  A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, *People v. Clark*, 2015 COA 44, ¶ 215, and it "necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence," *Wadle*, 97 P.3d at 936 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

¶ 10    The underlying issue of whether extraneous prejudicial information was before the jury presents a mixed question of law and fact.  *Kendrick*, 252 P.3d at 1064; *People v. Holt*, 266 P.3d 442,

4

444 (Colo. App. 2011). We review de novo the trial court's conclusions of law, but we defer to the court's findings of fact if they are supported by competent evidence in the record. *People v. Harlan*, 109 P.3d 616, 624 (Colo. 2005). *But see Kendrick*, 252 P.3d at 1064 ("We apply an abuse of discretion standard to the court's findings of fact . . . .").

### III. Applicable Law

#### A. CRE 606(b)

¶ 11    A juror is generally prohibited from testifying about any "matter or statement occurring during the course of the jury's deliberations" or about "the effect of anything upon his or any other juror's mind or emotions." CRE 606(b); *Kendrick*, 252 P.3d at 1063. Nor may a court receive an "affidavit or evidence of any statement by [a] juror" concerning as much. CRE 606(b); *Kendrick*, 252 P.3d at 1063. This rule seeks to "promote finality of verdicts, shield verdicts from impeachment, and protect jurors from harassment and coercion," and thus "strongly disfavors any juror testimony impeaching a verdict." *Harlan*, 109 P.3d at 624; *see also Kendrick*, 252 P.3d at 1063.

¶ 12    However, notwithstanding the rule's broad limitations, CRE 606(b) contains narrow exceptions, one of which permits a juror to testify as to "whether extraneous prejudicial information was improperly brought to the jurors' attention." CRE 606(b)(1). To determine whether a defendant is entitled to a new trial based on the jury's exposure to extraneous prejudicial information, a court employs a two-part inquiry. *Kendrick*, 252 P.3d at 1063; *Harlan*, 109 P.3d at 624. First, "a court makes a determination that extraneous information was improperly before the jury." *Harlan*, 109 P.3d at 624. Second, "based on an objective 'typical juror' standard, [a court] makes a determination whether use of that extraneous information posed the reasonable possibility of prejudice to the defendant." *Id.*

¶ 13    "When a party seeks to impeach a verdict based on an allegation of juror misconduct, the party has a limited right to an evidentiary hearing on those allegations." *Kendrick*, 252 P.3d at 1063. However, CRE 606(b) limits a trial court's ability to inquire into such allegations. *Clark*, ¶ 218. "[I]n order to satisfy CRE 606(b), before granting a hearing the court must first conclude that the party alleging misconduct has presented competent evidence

6

that extraneous prejudicial information was before the jury."
*Kendrick*, 252 P.3d at 1063-64 (citing *Harlan*, 109 P.3d at 624).

¶ 14    We note that the supreme court has used the phrase "competent evidence" in this context in two different ways. In *Harlan*, 109 P.3d at 623, the supreme court referred to "competent evidence" as the standard for reviewing the trial court's findings of fact after an evidentiary hearing. But in *Kendrick*, 252 P.3d at 1063-64, the phrase refers to the threshold showing necessary to be entitled to an evidentiary hearing in the first place. Clearly, these required showings cannot be the same, lest the quantum of evidence creating the entitlement to the hearing would necessarily also be sufficient to warrant relief in every case in which a hearing was granted — thus making any hearing unnecessary. Rather, in the context of the showing necessary to be entitled to a hearing, "competent evidence" merely means evidence that is admissible under CRE 606(b), *People v. Garcia*, 752 P.2d 570, 583 (Colo. 1988), which indicates that prejudicial extraneous information may have been before the jury, *Clark*, ¶ 239.

## B. Extraneous Prejudicial Information

¶ 15 In *Kendrick,* our supreme court reiterated that "jurors are required to consider only the evidence admitted at trial and the law as given in the trial court's instructions." 252 P.3d at 1064 (quoting *Harlan,* 109 P.3d at 624). Accordingly, "any information that is not properly received into evidence or included in the court's instructions is extraneous to the case and improper for juror consideration." *Id.* (quoting *Harlan,* 109 P.3d at 624). The court observed that extraneous prejudicial information consists of (1) "legal content and specific factual information" (2) "learned from outside the record" (3) that is "relevant to the issues in a case." *Id.*

### 1. Legal Content

¶ 16 We turn first to the question of what constitutes "legal content." Because *Kendrick* involved a challenge to extraneous factual, rather than legal, information, the supreme court did not define the term "legal content." *See id.* at 1066 (considering only a "juror's use of her background in engineering and mathematics to calculate . . . speed, distance, and reaction time"). Indeed, no published case in Colorado has yet provided a definition of "legal content" in this context. Nor, as relevant here, has any Colorado

case navigated the fine line between a lawyer-juror's permitted application of her background professional and educational experience and the impermissible introduction of "legal content . . . learned from outside the record." *Id.* at 1064 (citing *Harlan*, 109 P.3d at 625). Resolving the issue before us requires that we do so now.

¶ 17 Though our supreme court has not defined the term, we do find guidance in some of the court's prior decisions.

¶ 18 In *Harlan*, during their deliberations in the death penalty phase of a case, one or more jurors consulted various passages from the Bible regarding the punishment for murder and introduced that information into the jury room for consideration by other jurors. 109 P.3d at 629. The court observed that "'Holy Scripture' has factual and legal import for many citizens and the actual text introduced into the deliberations without authorization by the trial court plainly instructs mandatory imposition of the death penalty, contrary to state law." *Id.* at 633. "Such a 'fact' is not one presented in evidence in this case and such a 'legal instruction' is not the law of the state or part of the court's instructions." *Id.* at 632. Thus, to the extent the Biblical passages

were considered legal, rather than factual, they were improper because they conflicted both with Colorado law and with the trial court's instructions.

¶ 19     In *Wiser v. People*, 732 P.2d 1139 (Colo. 1987), a juror consulted a dictionary for a definition of burglary, which was one of the crimes with which the defendant was charged. *Id.* at 1140. The court concluded that the juror's conduct was improper. *Id.* at 1141. "Jurors are required to follow only the law as it is given in the court's instructions; they are bound, therefore, to accept the court's definitions of legal concepts and to obtain clarifications of any ambiguities in terminology from the trial judge, not from extraneous sources." *Id.* (quoting *Niemand v. Dist. Court*, 684 P.2d 931, 934 (Colo. 1984)).

¶ 20     Indeed, *Niemand* also provides some guidance. In that case, the supreme court was not directly addressing a claim involving a juror introducing extraneous prejudicial information. Rather, the trial court had already ordered a new trial because a juror had independently researched various definitions in Black's Law Dictionary related to second degree murder and manslaughter. 684 P.2d at 932-33. The supreme court was asked to resolve whether,

having been convicted only of second degree murder in the first trial, the defendant could be retried for first degree murder after his conviction was vacated as a result of the juror's misconduct. *Id.* at 934. But, relevant to our inquiry, in *Niemand,* the court acknowledged that the juror's misconduct included reviewing definitions of terms such as "malice," "depravity of heart," "passionless," "implied malice," and "atrocity," among others. *Id.* at 932 & n.1. Significantly, these terms were not included in any of the trial court's instructions to the jury.

¶ 21     Finally, in *Alvarez v. People,* 653 P.2d 1127 (Colo. 1982), the trial court had provided the jury with the standard definition of "reasonable doubt." *Id.* at 1130 & n.7. "One of the jurors was troubled as to whether her doubts were 'reasonable,' 'imaginary,' or 'vague,' terms used in the reasonable doubt instruction, and she consulted her dictionary at home for the definitions of these words." *Id.* at 1130. After discussing her research with another juror, she decided that her doubts were not reasonable, and she voted to find the defendant guilty. *Id.* The supreme court stated that "[t]here can be no question but that a juror's consultation of a dictionary to

11

assist in understanding legal terminology in the court's instructions is improper." *Id.* at 1131.

¶ 22     Another division of this court faced a similar claim.  In *Holt,* the prosecution conceded, and the division agreed, that where the defendant was charged with vehicular eluding, several jurors acted improperly when they consulted a dictionary definition of "elude." However, the division rejected the defendant's challenge to one juror's statement that, based on his personal experience, vehicular eluding was a minor traffic violation the penalty for which is a "slap on the wrist." *Holt*, 266 P.3d at 444.  The division observed that the juror did not introduce into the jury room language from the Colorado Revised Statutes or "an article purporting to describe or characterize the penalty for vehicular eluding." *Id.* at 446.  The division stated that

> [t]he emphasis on the exception for legal content precludes any suggestion that lawyers and other individuals trained in certain aspects of the law may use knowledge acquired through their training and experience *in deciding what law applies* to resolve a matter before them and share that knowledge with other members of the jury.

*Id.* at 445-46 (emphasis added).

12

¶ 23    As these cases make clear, "legal content" means a statement of law.

¶ 24    But does legal content include more than just statements of law?  For example, if a juror is a lawyer, is any comment related to the legal aspects of the case necessarily within the proscription against introducing "legal content"?  For the reasons that follow, we answer these questions "no."

¶ 25    First, we are hesitant to construe "legal content" so broadly, as too expansive a definition risks nullifying the General Assembly's intent that attorneys be permitted to serve as jurors.  *See* Ch. 159, sec. 6, § 16-10-103, 1998 Colo. Sess. Laws 466 (repealing the statutory provision that automatically disqualified all lawyers from serving on a jury).  The legislature must have understood that lawyers serving as jurors would, just as any other jurors, necessarily draw on their experiences in performing their duties. For example, a lawyer-juror must be able to draw on his or her education and experience in assessing the evidence, and any reasonable inferences to be drawn from it.

¶ 26    In *United States v. McCall,* No. CR 00-0505 WHA, 2009 WL 10681057 (N.D. Cal. Dec. 22, 2009), the United States District

Court for the Northern District of California rejected an argument that a juror introduced extraneous information when she "necessarily drew on her particular expertise [as a lawyer], not common to all jurors as part of the personal experiences all jurors bring to the deliberations." *Id.* at *3. Citing precedent from the Ninth Circuit, the court noted that "a juror's personal experience and knowledge including specialized professional training may be part of jury deliberations and is *not* extrinsic evidence." *Id.* (citing *Grotemeyer v. Hickman,* 393 F.3d 871 (9th Cir. 2004)). Accordingly, the court suggested that a lawyer-juror's "general legal knowledge" that is "not in any way specific to [the defendant] or the issues in the present action" is not extraneous prejudicial information. *Id.* at *4. The court reasoned that "[i]f defendant McCall were correct that lawyers necessarily share 'extrinsic information' with other jurors during deliberations by drawing on their expertise as attorneys, it would be impossible for lawyers to serve on juries at all." *Id.* at *3. Moreover, the court also cautioned that "[o]ur system would grind to a halt if venirepersons could be left on the jury and then be criticized after the verdict for doing nothing more than what was imminently (sic) foreseeable." *Id.*

¶ 27    Although the *McCall* court did not speak in terms of "legal content," its reasoning is nevertheless applicable here.  If we were to construe the concept of "legal content" so broadly as to encompass any information drawn from a lawyer-juror's professional background, attorneys would effectively be prohibited from serving as jurors.  But, as noted above, that would conflict with the intent of our legislature.  *See* Ch. 159, sec. 6, § 16-10-103, 1998 Colo. Sess. Laws 466.

¶ 28    Nor can we conclude that a lawyer-juror's legal training is problematic merely because that lawyer-juror will have pre-existing views about the law, or because his or her discussion of the case during deliberations will necessarily involve his or her experience with or understanding of legal principles and the legal system. "[V]irtually every juror will have preconceived notions about the legal process . . . ."  *Holt*, 266 P.3d at 446 (quoting *Fullwood v. Lee*, 290 F.3d 663, 684 (4th Cir. 2002)).  Construing "legal content" too broadly ignores the fact that, "[a]s a practical matter, it is impossible to select a jury free of preconceived notions about the legal system or to prevent discussion of such information in the jury room."  *Id.*  Indeed, "[n]either *Kendrick* nor prior supreme court

15

decisions evidence an intent to categorize such discussions as extraneous information under CRE 606(b)(1)." *Id.* To do so could expose jurors to greater post-trial scrutiny, which would undermine CRE 606's purpose to "promote finality of verdicts, shield verdicts from impeachment, and protect jurors from harassment and coercion." *Harlan*, 109 P.3d at 624; *see Holt*, 266 P.3d at 446.

¶ 29 Finally, "we are compelled to err in favor of the lesser of two evils — protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible juror activity." *Garcia v. People*, 997 P.2d 1, 7 (Colo. 2000) (quoting *United States v. Thomas*, 116 F.3d 606, 623 (2d Cir. 1997)). Narrowly construing "legal content" prioritizes such secrecy and promotes free discussion during deliberations.

¶ 30 Thus, we conclude that "legal content" in this context is limited to statements of law.

### 2. Outside the Record

¶ 31 Turning to *Kendrick*'s second prong, we must explore when a lawyer-juror's statements will be deemed extraneous.

¶ 32 Clearly, if a juror conducts an independent investigation into either the facts or the law, that juror introduces information from

outside the record. *See Wadle*, 97 P.3d at 937 (researching on the internet to learn about the effects of an anti-psychotic medication mentioned during testimony); *Wiser*, 732 P.2d at 1140 (consulting a dictionary for a definition of the crime charged). But what if the juror does not engage in an outside investigation, and relies on his or her memory and knowledge? Where is the line between a lawyer-juror appropriately drawing on his or her professional expertise and education and improperly introducing legal content?

¶ 33    As the supreme court noted in *Kendrick*, "[t]he line between a juror's application of her background professional and educational experience to the record evidence and a juror's introduction of legal content or specific factual information learned from outside the record can be a fine one." *Kendrick*, 252 P.3d at 1066.

¶ 34    The court in *Kendrick* "repeatedly emphasized that jurors may properly rely on their professional and educational expertise to inform their deliberations so long as they do not 'bring in' or 'introduce' legal content learned from outside the record." *Holt*, 266 P.3d at 445 (citing *Kendrick*, 252 P.3d at 1056, 1063, 1065-66). This admonishment safeguards the court's exclusive authority to instruct the jury. *See Harlan*, 109 P.3d at 624 ("[J]urors are

required to consider only the . . . law as given in the trial court's instructions . . . ."). In other words, the focus is on ensuring that the trial court, and not the lawyer-juror, is the source of all the law the jury considers.

¶ 35 Again, as the division recognized in *Holt*, lawyer-jurors may not "use knowledge acquired through their training and experience in deciding what law applies to resolve a matter before them and share that knowledge with other members of the jury." 266 P.3d 445-46. Thus, if the lawyer-juror (or any other juror) introduces a statement of law that is inconsistent with or supplemental to the instructions provided by the trial court, that statement is necessarily outside of the record. *Accord In re Stankewitz*, 708 P.2d 1260, 1262 (Cal. 1985) (defining "extraneous law" for purposes of impeaching a jury verdict as "a statement of law not given to the jury in the instructions of the court").

### 3. Relevant to Issues in the Case

¶ 36 The third prong of *Kendrick* requires that the challenged information be relevant to the issues before the jury. 252 P.3d at 1064. Again, this is part of the threshold inquiry into whether a

18

party is entitled to an evidentiary hearing. *Id.* at 1063-64 (citing *Harlan*, 109 P.3d at 624).

¶ 37 Recall that in *Holt*, the division rejected the defendant's challenge to a juror's observation, based on his personal experience, as to the severity of the offense and any potential punishment. Although this was in part based on the division's conclusion that the statement was not legal content, it also noted that "the severity of the vehicular eluding charge was not relevant to the issues in this case." *Holt*, 266 P.3d at 445.

¶ 38 In *People v. Bohl*, a juror in a homicide case had apparently conducted independent research regarding decomposition of a body after there was testimony that the body was decomposed during the autopsy. 2018 COA 152, ¶ 19. However, the key issue in the case was not how long the victim had been dead, but rather how long the victim had endured blunt force trauma before she died, as that related to whether the defendant had the requisite intent for first degree murder. *Id.* at ¶ 20. The defendant was not entitled to impeach the verdict because, in part, "any extraneous information that [the juror] obtained was not relevant to a key issue at trial." *Id.* at ¶ 26 (citing *Wiser*, 732 P.2d at 1143).

¶ 39     And in *Niemand*, the juror misconduct involved researching legal concepts that were related to the homicide charges at issue, but were not specifically elements.  684 P.2d at 932 & n.1.

¶ 40     Thus, if a statement of law relates to the definition or elements of the crime, it clearly satisfies the third prong of *Kendrick*.  *See, e.g., Wiser*, 732 P.2d at 1141.  But statements of law are also improper if they relate to any other issue before the jury.  *See Holt*, 266 P.3d at 445.

### 4.     Reasonable Possibility of Prejudice

¶ 41     Even if an attorney-juror introduces extraneous legal content, however, the defendant must still demonstrate prejudice.  *Harlan*, 109 P.3d at 625.  The test for whether an "extraneous" statement is also "prejudicial" is an objective one: "The relevant question for determining prejudice is whether there is a reasonable possibility that the extraneous information influenced the verdict to the detriment of the defendant."  *Id.*  Under this test, "a reviewing court cannot consider evidence of actual impact on specific jurors in the case."  *Id.*  Instead, it must look solely to whether there was a "realistic possibility that the communication would influence the verdict of a typical juror.'"  *Wadle*, 97 P.3d at 937.

¶ 42    In order to determine whether extraneous information created such a realistic possibility, the court may consider the following factors: (1) how the extraneous information relates to critical issues in the case; (2) how authoritative is the source consulted; (3) whether a juror initiated the search for the extraneous information; (4) whether the information obtained by one juror was brought to the attention of another juror; (5) whether the information was presented before the jury reached a unanimous verdict; and (6) whether the information would be likely to influence a typical juror to the detriment of the defendant. *Harlan,* 109 P.3d at 625.

¶ 43    In sum, like any other juror, a lawyer-juror must refrain from engaging in an independent investigation into a legal or factual matter relevant to the case. *See Clark,* ¶ 222. But a lawyer-juror must also refrain from introducing any statements of law (even if from memory) that conflict with or are supplemental to the instructions of law provided by the trial court. If a defendant presents competent evidence, admissible under CRE 606(b), that a lawyer-juror introduced such a statement of law related to an issue that was before the jury, and that there is a realistic possibility that

this information would influence a typical juror in reaching a verdict, the defendant is entitled to an evidentiary hearing.

## IV.    Analysis

¶ 44    Newman contends that the trial court erroneously denied his motion for a new trial.  He argues that, contrary to the findings of the trial court, his supporting affidavit sufficiently alleged that six of Juror M.O.'s statements constituted extraneous prejudicial information improperly before the jury.  Accordingly, he argues not only that the court was permitted to consider the statements under CRE 606(b), but that Juror M.O.'s misconduct warranted a new trial.  We address in turn each of Juror M.O.'s statements as presented in the affidavit and relied upon by Newman in this appeal.

### A.    Statement on the Significance of Character Witnesses

¶ 45    Juror S.P.'s affidavit alleged that during deliberations, Juror M.O. produced a piece of paper with a definition written on it.  She recounted the incident as follows:

> On the morning of August 15, 2016, during deliberations and prior to reaching a verdict, the juror who works as a lawyer addressed the group.  He said he had been thinking all weekend about the character witnesses not

22

being asked certain questions about Mr. Newman's personality. He said "I knew taking the bar would come in handy" and then pulled a piece of paper out of his pocket with a definition of law on it. It was something about character witnesses. I could not see what was written on the paper because I was sitting on the opposite side of the table.

I do not recall the specific wording of the definition but it included what could and could not be asked of character witnesses. The lawyer did not provide us with the source of this information. Since he said taking the bar came in handy I assumed it was a legal definition.

The lawyer read the definition off of the piece of paper. After reading the definition the lawyer told the group something to the effect of, Mr. Newman is a bad guy or they would have asked different questions and you should infer that from the lack of questions asked of the character witnesses.

The parties do not dispute that the lawyer referred to in the affidavit was M.O.

¶ 46    The People concede, and we agree, that the affidavit sufficiently alleged that Juror M.O. introduced extraneous information into deliberations under CRE 606(b). The affidavit unequivocally describes Juror M.O. presenting a legal definition. Indeed, the affidavit suggests that, rather than drawing from his

background legal knowledge, Juror M.O. conducted outside research and shared the results of that research with other jurors.[2] And while Juror S.P. could not recall the precise definition that Juror M.O. offered, the affidavit nonetheless alleges that Juror M.O. shared a statement of law pertaining to the admissibility of character evidence. Moreover, as the statement was used to draw inferences as to Newman's character, it was relevant to Newman's credibility. *See People v. Hall*, 107 P.3d 1073, 1075 (Colo. App. 2004) ("[C]haracter evidence may be defined as evidence that directly relates to the general credibility of the witness . . . ." (quoting 28 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6113 (1993))). Given the nature of the case, Newman's credibility was critical. Thus, the affidavit provided competent evidence that Juror M.O. introduced "legal content . . . learned from outside the record and relevant to the issues in a case." *Kendrick*, 252 P.3d at 1064.

---

[2] To be sure, the allegation that Juror M.O. injected this definition into the jury's deliberations is alone sufficient to allege the introduction of extraneous legal content; the fact that this legal definition was apparently the product of independent research rather than stated by Juror M.O. from memory merely compounds the misconduct.

¶ 47   However, the People dispute that Juror M.O.'s statement, as described in the affidavit, was prejudicial.  Specifically, the People cite to *Holt* for the proposition that the affidavit was insufficient to support such a finding because it did not describe Juror M.O.'s statement with more specificity.  The People's argument, however, misses the point.

¶ 48   In *Holt,* the trial court conducted a hearing on the defendant's request for a new trial.  266 P.3d at 443.  In other words, *Holt* does not stand for the proposition that the affidavit and motion alone must proffer sufficient evidence to establish Newman's right to a new trial.  Rather, as noted above, Newman need only bring forth sufficient admissible evidence to demonstrate that he may be so entitled.  By doing so, Newman is then entitled to a hearing at which he can further develop his claim.  Here, the trial court denied Newman's motion without a hearing, even though Newman specifically requested that the trial court hold an evidentiary hearing on the motion.

¶ 49   As noted, Newman asserts that Juror M.O. provided a definition of character evidence and used it to urge the jury to reject Newman's credibility and conclude that he was a bad person.  We

25

conclude that this is competent evidence and that a typical juror may have been swayed by this extraneous information.[3]  Because Newman "has put forth competent evidence, in the form of an affidavit, which indicates prejudicial extraneous information may have been before the jury," he is entitled to an evidentiary hearing. *Clark*, ¶ 239.  At the evidentiary hearing, Newman should be given the opportunity to present evidence "regarding the source of the extraneous information, the manner of its acquisition, its content, and its presence and use in the jury room during deliberations." *Harlan*, 109 P.3d at 625.[4]

¶ 50    On remand, the trial court cannot consider any evidence of Juror S.P.'s reaction to Juror M.O.'s statement, and instead must solely determine whether there was a "realistic possibility that the communication would influence the verdict of a typical juror.'" *Wadle*, 97 P.3d at 937.  Thus, we reject Newman's argument that

---

[3] Of course, our inquiry is limited to the threshold question of whether Newman has presented enough evidence to be entitled to a hearing.  The ultimate determination of whether there was extraneous prejudicial information introduced to the jury remains for the trial court to make upon the conclusion of the hearing.

[4] This necessarily means that Newman's counsel should be provided the necessary information to contact M.O. in order to call him to testify at the hearing.

we — and presumably the trial court — need not ask how a typical juror would have reacted, because we know how S.P. did react. This contention misunderstands the purpose of focusing on the typical juror. S.P.'s — or any other juror's — testimony about specific reactions to this extraneous information is prohibited by CRE 606(b). *Harlan*, 109 P.3d at 625 ("[A] reviewing court cannot consider evidence of actual impact on specific jurors in the case.").

### B.    Statement on the Significance of a Buccal Swab

¶ 51    Juror S.P. described the following discussion regarding Newman's prior buccal swab:

> I am not certain if the discussion regarding Mr. Newman's prior record began on Friday or Monday morning. On Monday however, it was discussed at length and another juror, [P.S.], commented that Mr. Newman had to have committed other felonies to get a buccal swab done. She presented this to the group as a fact. She told the group that it was likely to have been a prior sex offense. [Juror P.S.] told the group she had been on three other juries. The attorney said that [Juror P.S.] was correct. I tried to propose additional ways DNA would be entered into the system but the lawyer and [Juror P.S.] stated that I was wrong and it absolutely had to have been a felony. It was written on the board as a reason to convict.

27

¶ 52 The affidavit indicates that Juror M.O. agreed with, and later reiterated, another juror's conclusion that Newman "had to have committed other felonies to get a buccal swab done." But the statement is not one of law. Nor is it the introduction of new factual information. Rather, it is a factual conclusion drawn from the evidence before the jury. Thus, the affidavit does not allege that Juror M.O. introduced any "legal content [or] specific factual information." *Kendrick*, 252 P.3d at 1064. Nor does it suggest that Juror M.O. did anything more than permissibly apply his professional or general background to the record evidence. Accordingly, as to this statement, the affidavit did not provide competent evidence of extraneous prejudicial information. *Id.* As such, this statement is inadmissible and cannot be considered by the trial court. CRE 606(b).

### C. Statement on Prior Bad Acts Evidence

¶ 53 Juror S.P. further alleged as follows:

> The lawyer told the group that Mr. Newman was not asked about his sex life because those questions would have allowed for the district attorney to ask about all the prior things Mr. Newman was accused of or convicted of.

¶ 54    This allegation presents a closer call. On the one hand, the statement does not explicitly state that Juror M.O. offered a specific statement of what the law was in this area, as opposed to simply drawing an inference regarding what the lack of evidence may mean. Seen in this way, Juror M.O.'s statement arguably does no more than describe his "mental processes" during deliberations. On the other hand, his statement appears to explain, albeit incorrectly, rules of evidence concerning the admissibility of prior acts evidence. And, although the affidavit does not allege that Juror M.O. conducted outside research to obtain a specific rule or legal definition, as noted above, even a statement made from memory can introduce extraneous legal content if it is a statement of law that is inconsistent with or supplemental to the trial court's instructions.

¶ 55    Further, as alleged, this statement implicates Newman's character. As our supreme court has recognized, character evidence can be properly used "to discredit the truthfulness of a defendant," but is also capable of being improperly used "to prove the defendant committed the offense charged." *People v. Harding*, 104 P.3d 881, 887 (Colo. 2005), *overruled on other grounds by*

*Moore v. People*, 2014 CO 8. Either way, the statement was related to an issue before the jury.

¶ 56    In context, the lawyer-juror's alleged statement may have been an expression of what the law is in this critical area. Thus, Newman has met the threshold to obtain an evidentiary hearing on this allegation.

D.    Statement on Ineffective Assistance of Counsel and Attorney Misconduct

¶ 57    Juror S.P. alleged that Juror M.O. offered the following reasoning to discount part of Newman's testimony:

> During deliberations I asked the rest of the jury about Mr. Newman's testimony that he had [the complaining witness's] number in his phone. The attorney stated they don't have the phone, it does not exist, Mr. Newman is a liar. He told the group that if they had the phone they would have brought it. The attorney told us that if they had the phone Mr. Newman could file against his attorneys for incompetent counsel and the attorneys could be disbarred. The attorney presented this to the group as if it was the law.

¶ 58    The first part of Juror M.O.'s statement is not one of law. Rather, it is a reasonable inference that any juror could draw from the fact that the phone was not presented as evidence — i.e., that

30

the phone messages did not exist and that Newman's testimony was not credible.

¶ 59    The second part of Juror M.O.'s statement concerning attorney misconduct is arguably one of law.  But even if this statement constituted legal content, it was not "relevant to the issues in [the] case," *Kendrick*, 252 P.3d at 1064, as the issue of whether Newman's attorney was competent was not before the jury.  *See Holt*, 266 P.3d at 445 (holding that a juror's statement regarding the severity of the charge was not relevant to the issues in the case because the jury does not consider punishment when deliberating).  Because the first part of the statement was neither legal content nor factual information, and the second part of the statement (to the extent it was legal content) was not relevant to the issues before the jury, this statement is also inadmissible under CRE 606(b).

    E.    Statement That the Complaining Witness Did Not Have to
                        Participate in the Trial

¶ 60    As to the complaining witness's credibility, Juror S.P. alleged that Juror M.O. made the following statements:

> At another point during deliberations the
> attorney told the group that [the complaining
> witness] did not have to be at trial.  He said
> [she] had the power to drop the charges and

31

> never be contacted about this again. The
> attorney told us that [the complaining witness]
> must be telling the truth since she is still
> coming to court five years later.
>
> The lawyer told us [the complaining witness]
> could have walked away at any point in the
> last five years and this would have been let go.
> He said if this did not happen [she] would have
> simply walked away. He told us that it was
> [the complaining witness's] choice to come
> relive the event and experience it all over
> again. The lawyer told the group that by
> choosing to testify [the complaining witness]
> placed herself in danger of perjury charges and
> jail time if she were not telling the truth. He
> said she would never take that risk if she was
> lying. The attorney was very sure [the
> complaining witness] did not have to continue
> with the case and could have walked away
> without any repercussion.

¶ 61    The statements as recounted in the affidavit were not statements of law or factual information. Rather, Juror M.O. was simply offering his opinion as to why the jury ought to believe the complaining witness. To the extent his statements touched on the possibility of perjury charges, the affidavit does not indicate that he provided any sort of definition or explanation of perjury. Indeed, any lay juror could, in similar circumstances, opine that a witness should be believed because that witness would not likely perjure himself or herself; we cannot see how the fact that a lawyer-juror

32

says it would give it any more weight. Thus, in our view, Juror M.O. was not introducing a statement of law, but was permissibly applying his professional or general knowledge to inform deliberations. *See Kendrick*, 252 P.3d at 1066; *Holt*, 266 P.3d at 447. Thus, the affidavit lacks the necessary content to provide even a threshold showing of competent evidence that the information was prejudicial. Therefore, this statement is inadmissible. CRE 606(b).

### F. Statement That a Non-Unanimous Verdict Would Result in a Mistrial

¶ 62 Finally, Juror S.P. questioned what would happen if the jury did not reach a unanimous verdict. She alleged in her affidavit that Juror M.O. offered the following answer:

> [Juror M.O.] told us that it would result in a hung jury and a mistrial. He told us that would require a new trial but that would never happen. He said [the complaining witness] would never come back and testify again. He told us it would be too traumatic for her and we would be letting a rapist back out into the community.

¶ 63 First, the affidavit does not allege that Juror M.O. suggested that Newman legally could not be retried. Thus, in our view, his statement that a new trial would not occur was not a statement of

33

law. And to the extent his comment about the consequences of not reaching a unanimous verdict — i.e., a hung jury and a mistrial — could be considered a statement of law, it was not relevant to the elements of the charge or to any other issue before the jury. Thus, this statement, too, is inadmissible. CRE 606(b).

## V.   Conclusion

¶ 64    The judgment of conviction is vacated. The case is remanded to the trial court with instructions to hold an evidentiary hearing regarding the allegations pertaining to Juror M.O.'s introduction of a statement of law concerning character evidence and his statement concerning the implication of Newman not having been asked about prior conduct. If, after the hearing, the trial court finds that Juror M.O. introduced extraneous legal content that was prejudicial to Newman, it shall grant the motion for new trial. If the trial court again denies the motion for new trial, it shall resentence Newman and enter a new judgment of conviction.

JUDGE ROMÁN and JUDGE PAWAR concur.